In re John M. VOLPENTESTA, Debtor.

Noel RODRIGUEZ, Plaintiff,

v.

John M. VOLPENTESTA, Defendant.

**Bankruptcy No. 95 B 7286.
Adv. No. 95 A 00690.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 26, 1995.

W.K. Gullberg, Jr., Gullberg & Jordan, Chicago, IL, for plaintiff.

Kenneth W. Bley, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Upon the motion of Plaintiff, Noel Rodriguez, for default against the Defendant for failure to timely answer or otherwise plead, the Court having conducted a hearing after due notice, the Court, by separate order, having found the Defendant in default, held all the allegations of Plaintiff's Complaint confessed as true against the Defendant. The Court, having conducted a hearing for proof of facts necessary for the entry of a final judgment on Plaintiff's Complaint as requested and noticed in Plaintiff's motion for default, enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The Defendant filed his voluntary petition under Chapter 7 on April 12, 1995.

2. The deadline for filing complaints to determine the dischargeability of debts was established and noticed to creditors as July 10, 1995.

3. On June 6, 1995, the Defendant filed schedules A through J and his Statement of Financial Affairs.

4. On June 16, 1995, the Plaintiff, Noel Rodriguez, filed his Pro Se adversary complaint in case number 95 A 00690 (hereinafter the "Complaint").

5. Summons and the Adversary Complaint were served upon the Defendant on June 24, 1995.

6. On July 13, 1995, the Defendant's underlying Chapter 7 case was dismissed for bad faith filing.

### Allegations of Complaint
#### Allegations of Fraud

7. **Misrepresentation.** Plaintiff alleged in his Complaint that on (a) October 29, 1994, (b) November 14, 1994, (c) later in November, and (d) on November 24, 1994, respectively, the Defendant made false representations to the Plaintiff (a) that the Defendant was an agent for an investor group that would give a construction loan to the Plaintiff, [Complaint, ¶ 6], (b) that for a fee of $7,200 Defendant would issue an irrevocable letter of commitment for the construction loan [Complaint ¶ 7], (c) that for an additional fee of $3,000 Defendant would speed up the loan process and reduce the additional costs of the loan [Complaint ¶ 8], and (d) that for $35,000, Plaintiff could invest in certain property which Defendant had or was purchasing using a similar irrevocable letter of commitment.

8. **Intent.** The Complaint alleges that the Defendant knew the misrepresentations were false and that the Defendant made

them with the intent to defraud Plaintiff. The Plaintiff alleged that the Defendant engaged in fraud schemes and intentionally deceived his creditors [Complaint, ¶ 3], that the Plaintiff was duped by Defendant [Complaint, ¶ 4], and that the misrepresentations made by Defendant to Plaintiff were materially false and intentional. [Complaint, ¶ 10]

9. **Reliance.** Plaintiff alleged in his Complaint that he relied upon the Defendant's misrepresentation and paid money to him personally [Complaint, ¶ 8, ¶ 10], that he was enticed to pay money to the Defendant personally [Complaint, ¶ 7, ¶ 9], and that he was duped by the Defendant into paying him large sums of money [Complaint, ¶ 4].

10. **Damage.** Plaintiff alleged that the irrevocable letters of commitment for which he paid Plaintiff $10,200 were in fact worthless [Complaint, ¶ 7, 8, 9], that the property in which Defendant sold Plaintiff a $35,000 investment using a similar worthless irrevocable commitment letter "never materialized" [Complaint, ¶ 9], and that the Defendant instead used the money to purchase a new car for himself [Complaint, ¶ 4].

### Allegations of Concealment and False Oath

11. The Plaintiff alleged that the Defendant intentionally concealed his ownership of the new car from his creditors by fraudulent means [Complaint ¶ 4], that the concealment made it impossible to ascertain the Defendant's true financial condition [Complaint ¶ 4], that Defendant concealed the approximate $45,000 of funds he fraudulently gained from Plaintiff [Complaint, ¶ 10], and that the Defendant knowingly and fraudulently made false oaths on the schedules of assets and verified Statement of Financial Affairs he filed with the Court. [Complaint, ¶ 5].

### Relief Requested by Plaintiff

12. The Plaintiff requested in his Complaint that the Defendant's discharge be denied entirely, that the Plaintiff be granted a judgment in his favor against the Defendant, and that the Defendant be denied a discharge his debt to Plaintiff arising out of the fraud.

13. Each of the facts alleged by Plaintiff in his Pro Se Complaint are found as true by virtue of the previously entered Default Order.

### Findings From Evidence Produced at Prove Up Hearing.

#### Testimony of Noel Rodriguez

*Fraud Relating to Specious Financing Commitment Letter.*

14. Noel Rodriguez, the Plaintiff, is 33 years of age and resides at 1638 North Bell, in Chicago. He is in the business of real estate development, which he began in 1994. His relationship with the Defendant centers around new condominium units which the Plaintiff is building in the area of Chicago commonly referred to as the Bucktown area.

15. On or about October 28, 1994, the Plaintiff's architect, Pablo Morales, informed Plaintiff that he had become acquainted with a person he described as Mr. Volpe. Morales said that Volpe had $4 million dollars which he needed to invest before the end of the year. Morales also said that he was present with Volpe when Volpe recently purchased a large building.

16. Mr. Volpe was in fact the Defendant, John M. Volpentesta. The Plaintiff later noticed documents in the Defendant's possession with the Defendant's name on them. When the Plaintiff asked who John Volpentesta, the Defendant answered that he was John Volpentesta, but that he used the name Volpe because people often had trouble spelling his actual name.

17. The Plaintiff asked Morales to speak to "Mr. Volpe" about possibly financing approximately $500,000 of a new 12 unit condominium project the Plaintiff was constructing at 1600 N. Bell Street in Chicago.

18. On or about November 7, 1994, Plaintiff gave plans and specifications on the North Bell project to Morales for the purpose of Morales explaining the project to the Defendant.

19. On or about November 8, 1994, Morales informed Plaintiff that the Defendant was interested in financing the North Bell project and that the Defendant would be in contact with the Plaintiff directly in the next few days.

20. On Friday, November 11, 1994, the Defendant telephoned Plaintiff and informed Plaintiff that he was interested in financing the North Bell project and requested that Plaintiff transmit a notarized personal financial statement to him at Robert Anderson's office in Evanston, which Plaintiff did.

21. On Saturday, November 12, 1994, the Plaintiff met with Defendant in Morales' office. At that time, the Defendant showed Plaintiff several documents entitled "Irrevocable Letter of Commitment" on the letterhead of R & R Investments. One of the letters exceeded $2,000,000 and the smallest one was addressed to the Plaintiff in the amount of $480,000. The Defendant represented that the letters of commitment were "good as gold" and entitled the recipient to go into any bank and draw the amount specified on the letter.

22. At the same time, the Defendant told the Plaintiff that a person he referred to as David Evans owned a bank in Canada, that Evans represented investors, who, with Evans, would personally invest large sums of money in United States real estate in 1995.

23. Also on November 12, 1994, the Defendant represented to Plaintiff that David Evans' investments in United States real estate would be channeled through R & R Investments, for which the Defendant was a regional agent, and that the Defendant would be given increments of $20,000,000 to invest in the Chicago area.

24. At the same time, the Defendant informed the Plaintiff that he had secured approval from R & R Investments for financing of $480,000 on Plaintiff's North Bell project.

25. The Defendant informed the Plaintiff that, while he could use the letter of commitment to draw the $480,000 from any commercial bank, R & R could fund the loan itself and was prepared to close within the next week. Plaintiff informed the Defendant that he did not want to close so soon, but he would need to close in 3 or 4 weeks.

26. The Defendant requested that Plaintiff then pay 1 and ½ points, being $7,200.00, as a fee to secured the letter of commitment financing.

27. Plaintiff informed the Defendant that he wished to wait until the work week so as to be able to consult with his attorney on the proposed financing. The Defendant then got upset and said he worked hard to get Plaintiff the financing and that the Plaintiff has wasted his time. The Plaintiff then left Morales' office.

28. Later on November 12, 1994 or the next day, Plaintiff spoke to Morales, who assured Plaintiff that Defendant was reputable and that Defendant was working with Robert Anderson. Robert Anderson was a person for whom Plaintiff had high regard as Plaintiff was acquainted with Anderson's real estate development work.

29. Between November 12 and November 14, 1994, the Defendant visited the Plaintiff's construction site on North Bell and took pictures of the work being performed there. Defendant approached Plaintiff and asked if he was ready to procure the proposed letter of commitment financing.

30. On November 14, 1994, Plaintiff, in reliance upon Defendant's representations that the letter of commitment would entitle him to a construction loan from any bank of his choosing and that R & R Investments would itself make the $480,000 loan and close on same in a timely manner, the Plaintiff paid the Defendant $7,200.00 and received a commitment letter dated November 11, 1994.

31. The November 11, 1994 irrevocable letter of commitment (admitted into evidence as Plaintiff's Exhibit 1) informed Plaintiff that his loan request had been approved by an "Investment Affiliate" of R & R in the amount of $480,000 for a 5 year term, with a 5% loan fee, an amortization period of 10 years, with the North Bell apartments as collateral. The commitment letter was signed by Richard W. Brown, President of R & R Investments.

32. After November 14, 1994, Defendant informed Plaintiff that R & R Investments would fund the loan and was working on doing so.

33. On or about the first week of December, 1994, Defendant represented to Plaintiff that for an additional $3,000, he could guar-

antee a pre-Christmas closing from R & R Investments and drop the 5 point fee on the loan to zero. The Defendant informed Plaintiff that he was taking a trip out of town and needed cash and asked Plaintiff to pay him the $3,000 in cash.

34. In reliance upon this representation, Plaintiff paid the Defendant an additional $3,000 by making a check out to himself (Plaintiff's Exhibit 3 admitted into evidence), taking the check to his bank, exchanging it for $3,000 in currency, and delivering the $3,000 in currency to the Defendant.

35. From December of 1994 through February of 1995, Plaintiff, personally and through his attorneys, telephoned the Defendant and R & R Investments and was assured by both that R & R would soon fund the loan, that Plaintiff had submitted all the paperwork necessary for him to submit, but that the paperwork was not quite completed on R & R Investment's end of the transaction.

36. On or about March, 1995, Plaintiff informed Sergio Martucci, a member of the Board of Directors of Midwest Bank, of the existence of the letter of commitment and Plaintiff's understanding of the borrowing authority he had under it. Sometime later, Plaintiff met with Christopher Woods, a loan officer of Midwest Bank and showed him the R & R Investment irrevocable letter of commitment. Christopher Woods informed the Plaintiff that the letter was in fact worthless.

37. Contrary to Defendant's representations, the R & R irrevocable letter of commitment was in fact worthless and did not authorize Plaintiff to borrow any funds.

38. R & R Investments never funded the letter of commitment, although individuals purporting to be agents of R & R Investments promised to do so on multiple occasions.

39. At present, the telephone numbers listed on the R & R Investments letterhead are disconnected.

40. Neither the Defendant nor R & R Investments ever requested evidence of ownership or title on the North Bell project from Plaintiff.

41. Plaintiff, on or about May, 1995, received financing pertaining to the North Bell project from Midwest Bank.

### Fraud Relating to Short Term Loan and Investment

42. On November 24, 1994, the Defendant showed Plaintiff architectural drawings relating to property 1714 N. Damen. Defendant represented that he had a binding contract to purchase the property, that financing was in place with R & R Investments, that he had a closing set for the first week in January, 1995, and that the only thing left to occur was to show up at the closing.

43. The Defendant offered Plaintiff an investment and short term loan on the 1714 North Damen property. Defendant proposed that Plaintiff loan him $35,000 and receive in exchange the repayment of all of the loan principal on January 2, 1995 and the greater of 3.5% of the development profit from the property or $70,000.

44. In reliance upon these representations, Plaintiff agreed to loan Defendant $35,000 on the terms proposed by Defendant.

45. The loan agreement was reduced to writing signed by Defendant (Plaintiff's Exhibit 5 admitted into evidence) signed by Defendant, individually and for Jem Development Co.

46. The $35,000 check which Plaintiff wrote to Defendant, and which Defendant negotiated was entered into evidence as Plaintiff's Exhibit 4. The Defendant cashed the check, and in doing so requisitioned a cashier check in the amount of $33,000, Plaintiff's Exhibit 6 admitted into evidence, made payable to himself.

47. The Plaintiff testified that he believed all of the representations made by the Defendant to him, that he had no reason not to believe them, and that he trusted his architect who vouched for the Defendant's integrity. The Plaintiff further testified that he respected Robert Anderson, with whom the architect and the Defendant led him to believe he was affiliated, and this apparent affiliation affirmed his confidence in the Defendant and his representations.

48. The Court finds all of the Plaintiff's testimony credible and adopts all such testimony as additional findings of fact.

### Affidavit of Patricia Boylan

49. The affidavit of Patricia Boylan dated September 14, 1995 was admitted into evidence. In her affidavit, Patricia Boylan states that she is a real estate agent, and that she is familiar with the Defendant.

50. Ms. Boylan states that her firm listed the 1714 North Damen property for sale on October 31, 1994 and that, contrary to his representations to Plaintiff, the Defendant never had an agreement to purchase that property.

51. Ms. Boylan also testified in her affidavit that she is familiar with the property known as 1855 North Damen, that the Defendant did enter into a contract to purchase that property, that she was a broker participating in the proposed sale, that the purchase contract called for financing of the purchase price by R & R Investments, that the Defendant never closed on the contract, that when the time came for closing, the closing kept getting pushed back because the financing was not forthcoming, that the Defendant kept saying that the financing would soon be forthcoming from R & R Investment, and that it was her observation that it became painfully obvious to the seller that the money for the purchase was not really available.

52. The Court finds Patricia Boylan's testimony credible and adopts the statements made therein as additional findings of fact.

### Testimony of Robert Anderson

53. Robert Anderson testified that he is in the business of real estate development and finance.

54. Mr. Anderson testified that he had known the Defendant since 1989 when the Defendant sought financing from him. Anderson declined the financing in 1989, but one of his partners agreed to provide it. Anderson testified that the deal did not work out well for his partner. The Defendant again approached Anderson in 1993 for residential financing. Anderson declined, informing the Defendant that he was not in the business of providing residential financing.

55. The Defendant approached Anderson in October of 1994. The Defendant told Anderson that he was in trouble, that he had been divorced from his spouse, who received his house in the divorce settlement, that he had just gotten out of prison on a bad check conviction, that he was on probation, and needed a way to make a living.

56. Anderson testified that he then had commission work available to follow up on and close leads on remodeling work, and that he entered into a contractual agreement with the Defendant under which the Defendant would perform the work on a commission basis.

57. Anderson testified within a couple of days after commencing work at Anderson's office in Evanston, Illinois, Volpentesta began actively shopping for a new vehicle. He told Anderson he wanted a 1995 white Jeep Grand Cherokee with leather interior. Within a few days, Anderson's office was receiving calls from several Jeep dealers. Anderson asked Volpentesta how he could afford the vehicle if he was broke and Volpentesta said that he was a regional representative of R & R Investment, a Michigan company which placed financing for David Evans and Evans' Canadian offshore bank, and R & R had issued an irrevocable letter of credit for Volpentesta to purchase the vehicle.

58. Anderson testified that soon thereafter, Volpentesta began driving a new, 1995 white Jeep Cherokee with leather interior. Also soon thereafter, Anderson's office began getting calls from Premier Jeep Eagle demanding payment for the Jeep.

59. Anderson testified that on or about Nov. 28, 1994, Volpentesta informed Anderson that R & R had come through with the loan and had issued a $33,000 cashier's check to him. Volpentesta informed Anderson that he could not have a checking account due to his former conviction and asked Anderson to deposit the cashiers' check into one of Anderson's accounts, pay $30,050 to Premier Jeep Eagle, pay $350 in cash to Volpentesta, and keep the remainder in partial payment for funds which Volpentesta then owed Anderson.

60. Anderson agreed to do so. He testified that he recognized the $33,000 cashier's check, Plaintiff's Exhibit 6, as the check the Defendant presented to him, and that he recognized the endorsement as his endorsement into the account of Remodeling Contract Plus, Inc., one of Anderson's companies. Anderson further testified that Plaintiff's Exhibit 8 was a true and accurate copy of Remodeling Contract Plus' bank statement containing the $33,000 deposit on November 28, and that Plaintiff's Exhibit 9 contained true and accurate copies of two checks he wrote at the behest of Defendant on November 29, 1994; one to Premier Jeep in the amount of $30,050, and one to the Defendant in the amount of $350. Anderson testified that he received credit in his Remodeling plus account for the $33,000 check and that both the Premier Jeep and Volpentesta checks written on that account were paid by his bank.

61. Anderson further testified that he was familiar with the name "Jem Builders", that it was a name assumed by Volpentesta and used by Volpentesta in his business dealings; and that Volpentesta often also used the name "Jem Development" interchangeably with the name "Jem Builders". Anderson testified that the Defendant told him that he needed a new name to get back into business and he was using the name "Jem Builders".

62. Anderson further testified that he is familiar with Janet Kelner, that she is the girlfriend and co-inhabitant of the Defendant, and that she is employed as a waitress. He further testified that he knows that Ms. Kelner is subordinate to and controlled by the Defendant and that Jem Builders is controlled by the Defendant.

63. Anderson testified that he recognized the form of the R & R Investments irrevocable letter of commitment admitted as Plaintiff's Exhibit 1. He testified that he received two R & R letters of commitment from the Defendant which were identical in material respects to Plaintiff's Exhibit 1, that the Defendant attempted to get him to pay a partial amount of the loan fees at the time the letters were issued but that he refused to do so. Anderson stated that he took one of the two letters he received from the Defendant to a mortgage banker and attempted to borrow on it, that the mortgage banker investigated and reported to him the R & R irrevocable letter of commitment was worthless.

64. Anderson testified that the R & R irrevocable letter of commitment is referred to in the real estate finance business as a "fee scam". The letter is phony and there is no actual commitment. The letter represents that the loan fee will be paid at closing, but the objective of the scam is to get the victim to pay as much of the loan fee up front as possible.

65. The Court finds that the testimony of Robert Anderson is credible and accepts all of his testimony as additional findings of fact.

## FINDINGS OF FACT BASED UPON TESTIMONY AND EVIDENCE

From the testimony of the Plaintiff, the affidavit of Ms. Boylan, the testimony of Robert Anderson, and the documents submitted into evidence by the Plaintiff, all of which were admitted into evidence, the Court makes additional findings of fact as follows:

### Relating to Specious Financing Commitment

66. The representations made by the Defendant to Plaintiff that the R & R irrevocable letter of commitment which Defendant offer to Plaintiff was "good as gold" and would entitle Plaintiff to go into any bank and draw the amount specified in the letter were false.

67. The representation made by Defendant to Plaintiff that R & R Investments would fund the $480,000 loan as specified in the November 11, 1994 irrevocable letter of commitment was false.

68. The Defendant knew the representations he made to Plaintiff regarding the R & R irrevocable letter of commitment were false. Alternatively, Defendant made those representations to Plaintiff with such reckless disregard for the truth as to constitute wilful misrepresentation.

69. In making the false representations to Plaintiff, Defendant possessed an actual

intent to defraud Plaintiff. Defendant's actual intent to defraud is established by the findings resulting from the default order, by the circumstances surrounding the representations, the specious nature of the R & R irrevocable letters of commitment, and the fact that neither Defendant nor R & R Investments ever requested evidence of ownership or title on the North Bell project from Plaintiff.

70. The Plaintiff actually and reasonably relied on the Defendants representations that he would be able to obtain financing, from a bank or from R & R Investments, by paying Defendant $7,200.00 in exchange for the R & R irrevocable letter of commitment dated November 11, 1994.

71. The Defendant's representation to Plaintiff, on or about the first week of December, 1994, that for an additional $3,000.00 fee, he could guarantee a pre-Christmas closing by R & R Investments and a zero point loan, was false.

72. The Defendant knew that the representations he made about the pre-Christmas closing and zero point loan were false when he made them. Alternatively, he made these representations with such reckless disregard for the truth that they constitute wilful misrepresentations.

73. The Plaintiff actually and reasonably relied upon these representations in paying the Defendant another $3,000 loan fee.

74. The Defendant's representations that R & R would shortly fund the $480,000 loan were knowingly false.

75. All of the misrepresentations made by the Defendant concerning the R & R irrevocable letters of commitment were misrepresentations of material facts.

76. Defendant made all of the misrepresentations to Defendant concerning the R & R irrevocable letters of commitment with the intent to defraud Plaintiff.

77. By reason of his reliance upon the false representations made by Defendant concerning the R & R irrevocable letter of commitment, Plaintiff suffered losses and damages of $10,200.

### Relating to Short Term Loan and Investment

78. Defendant's representations to Plaintiff that he had a binding contract to purchase the property, that financing was in place with R & R Investments, that he had a closing set for the first week in January, 1995, and that the only thing left to occur was to show up at the closing were false representations of material facts.

79. Defendant's misrepresentations to Plaintiff that Plaintiff's proposed $35,000 loan to Defendant would be short term, that Plaintiff would receive repayment of all of his principal on January 2, 1995 plus the greater of $70,000 or 3.5% of the development profit from the 1714 North Damen property were false representations of material facts.

80. The Defendant knew these misrepresentations were false. Alternatively, Defendant made these representations to Plaintiff with such reckless disregard for the truth that the constitute wilful misrepresentations.

81. In making the misrepresentations to Plaintiff, Defendant possessed an actual intent to defraud Plaintiff. The actual intent to defraud is established by the circumstances surrounding the misrepresentations, including the fact that Defendant had no interest in the property in question and the fact that he used the proceeds of the Plaintiff's loan to him to purchase a new 1995 Jeep Cherokee for over $30,000.

82. The Plaintiff actually and reasonably relied upon the Defendant's misrepresentations and paid the Defendant $35,000.

83. By reason of his reliance upon the false representations made by the Defendant, the Plaintiff suffered a loss or damage of $35,000.

### Relating to Concealment and False Oath

84. According to vehicle title documents certified as true and correct by the Illinois Secretary of State on September 13, 1995, and admitted into evidence as Plaintiff's Exhibit 10, the Defendant acquired, free of liens, a 1995 Jeep Grand Cherokee, vehicle identification number 1J4GZ78Y4SC564396 (the "Jeep"), from Premier Jeep/Eagle, 6949 W. Grand Ave., Chicago, on November 28, 1994. According to the same certified docu-

ments, the Jeep is still owned by John M. Volpentesta and Jem Builders.

85. The Defendant filed his bankruptcy schedules and statement of financial affairs on June 6, 1995 and signed both under penalty of perjury.

86. Schedule B of Defendant's bankruptcy schedules omits any reference to the Jeep.

87. On page 2 of his Statement of Financial Affairs, the Defendant states as follows:

"1995 Jeep transferred to Jem Builders subject to liens. Jem Builders sold car for about $24,000 and paid debts totalling about $20,000. $4,000 balance applied to outstanding loans ...

In March, 1995, Jeep transferred to Jem Builders subject to liens. Debtor used Jeep until Jem sold Jeep for about $24,000 and paid claims totalling about $20,000, then applied balance to outstanding loans."

88. According to evidence previously admitted in the debtor's bankruptcy case, Jem Builders, Inc. was formed and is owned by Janet Kelner. According to the debtor's bankruptcy schedules, particularly page 3 of Schedule F, the Defendant and Janet Kelner are co-inhabitants. The Court takes judicial notice of these matters as additional findings of fact.

89. By stating in his Statement of Financial Affairs that the Jeep had been sold by Jem Builders when, in fact, it is still owned by the Defendant and Jem Builders, the Defendant knowingly and fraudulently made a false oath.

90. By stating in his Schedule of Financial Affairs that the Jeep was subject to liens when, in fact, it was not, the Defendant knowingly and fraudulently made a false oath.

91. By omitting the Jeep from his schedule of personal property, the debtor concealed property from the trustee and his creditors. From the circumstances, including the express misrepresentation contained in the Statement of Financial Affairs, the Court infers that the Defendant concealed the property with the intent of hindering, delaying, or defrauding his creditors and the trustee.

## FINDING OF FACTS RELATING TO ANCILLARY JURISDICTION

92. The underlying Chapter 7 case of the debtor was dismissed for bad faith filing by an order entered by this Court on July 13, 1995.

93. Noel Rodriguez, the Plaintiff in this adversary case, has expended substantial time, energy, and effort on the case first by acting pro se and then by hiring an attorney to represent him.

94. This case is nearly concluded. The Defendant defaulted by failing to timely file an answer to Plaintiff's Complaint or to timely otherwise plead.

95. After the Defendant's default, the Plaintiff expended substantial time and energy to prove up facts upon which the Court could enter a final judgment, calling several witnesses and procuring self-authenticating documents.

96. Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Conclusions of Law Relating to Supplemental Jurisdiction

97. When this adversary proceeding was filed, this Court had jurisdiction of it. The bankruptcy jurisdiction of the federal courts extends to "all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Code]" 28 U.S.C. § 1334(b).

98. When it was filed, the Complaint was a core proceeding pursuant to 28 U.S.C. 157(b)(2)(I), (J), and (O). The causes of action brought by Plaintiff relate to determinations of discharge, objections to discharge, and matters other than personal injury or wrongful death claims.

■ 99. Ordinarily, when a case is within federal jurisdiction when filed, it remains there even if subsequent events eliminate the original basis for federal jurisdiction. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 293, 58 S.Ct. 586, 592, 82 L.Ed.

845 (1938); *Pratt Central Park Limited Partnership v. Dames & Moore, Inc.* 60 F.3d 350, 351 (7th Cir.1995).

> "Otherwise a litigant who didn't like the way his case was going could, even on the eve of judgment, engineer its dismissal, allowing him to start over in a different court. Exactly the same danger would be created if the debtor in an adversary proceeding could bounce the proceeding out of federal court by procuring the dismissal of the underlying bankruptcy proceeding, which Chapman in effect did by defaulting on his Chapter 13 payment scheme."

*Chapman v. Currie Motors, Inc.,* 65 F.3d 78, 81 (7th Cir.1995).

100. In *Chapman,* the Seventh Circuit (Posner, J.) also held that, strategic considerations aside, the concept of "related to" jurisdiction is sufficiently capacious to protect the interest of judicial economy and argues powerfully for keeping a case in a court system when a case has proceeded through one court system and is almost finished there. *Id.,* at 81.

101. The issue in *Chapman* was whether the district court had the discretion to relinquish its jurisdiction over an adversary proceeding based solely and purely on state law claims when the underlying bankruptcy case was dismissed. The Seventh Circuit held that where the issues involved revolved solely around the meaning of a pair of state judgments, the federal link was so tenuous that the district court *had the discretion* to relinquish its related to jurisdiction, and that it properly exercised that discretion, even though jurisdiction over the adversary proceeding did not automatically end upon the dismissal of the underlying bankruptcy case. *Id.* at 81–82.

102. In *In re Statistical Tabulating Corp. Inc.,* 60 F.3d 1286, 76 A.F.T.R.2d (P–H) 5863 (7th Cir.1995), the Seventh Circuit (Rovner, J.) again stated that in the case of a related adversary proceeding or a related state law claim, the bankruptcy court would have the *discretion to retain or relinquish* jurisdiction over the related matter when the underlying bankruptcy proceeding is dismissed. *Id.* at 1287, n. 1. In *Statistical Tabulating,* a creditor, LaSalle Bank, argued that when an underlying case is dismissed, the bankruptcy court automatically loses jurisdiction. The bankruptcy court agreed. The Seventh Circuit reversed, holding that "section 349 of the Bankruptcy Code lists the various effects of dismissal of the underlying bankruptcy case; conspicuously absent from that list is automatic termination of jurisdiction of related cases." *Id.* at 1289. Because the proceeding in question was a remand by the district court after an appeal, and there continued to be a live controversy between two creditors not mooted by the dismissal, the Seventh Circuit held that the bankruptcy court *did not have the discretion to relinquish jurisdiction* as it would have had in the case of a related adversary proceeding, and that it was required to follow the directives of the remand. *Id.* at 1289.

■ 103. As *Chapman* and *Statistical Tabulating* make clear, this Court has discretion to retain jurisdiction over any adversary proceeding when dictated by judicial economy, fairness and convenience to the parties, and the degree of difficulty of the related legal issue involved. *In re Huntington Park Associates* (D.C.N.D.Ill.1993) 1993 WL 86802, 1993 U.S.Dist. LEXIS 3696. In addition, the court may consider whether the remedies sought by the plaintiff are unique bankruptcy remedies and, if they cannot be asserted outside bankruptcy, whether it would be unjust to permit the defendant to take advantage of the dismissal of the bankruptcy case. *In re Fleet Service Corp.* (Bankr.M.D.Fla.1992) 144 B.R. 909, 6 Fla. Law W.Fed.B. 232. Further, as discussed the *Chapman,* supra, a debtor/defendant should not have unfettered discretion to engineer the dismissal of an adversary proceeding by procuring, by default or otherwise, the dismissal of his underlying bankruptcy case.

■ 104. The Plaintiff has expended substantial time, energy, and effort on this case, first in acting pro se, and then in hiring an attorney to represent him.

105. The causes of action brought by the Plaintiff are not difficult for the bankruptcy court as they involve issues which this Court deals with routinely.

106. The non-dischargeability claims brought by the Plaintiff are unique remedies under the Bankruptcy Code and cannot be asserted outside of bankruptcy.

107. There is a strong federal interest in the issues raised in Plaintiff's adversary complaint. These interests include maintaining the integrity of the bankruptcy courts against erosion from concealment and false oaths of the kind made by Defendant and to prevent use of the bankruptcy process to hinder, defraud, and delay creditors like Plaintiff who have been defrauded by a debtor/defendant.

108. The Defendant has filed two bankruptcy petitions within the last two years, both of which have been dismissed for bad faith filing. It is foreseeable that the Defendant may file another bankruptcy petition, here or elsewhere, which, baring conclusion of this adversary proceeding, may further hinder and delay the Plaintiff in exercising his legal rights and remedies.

109. Due to the Defendant's default in answering or otherwise pleading, this adversary case is almost finished and judicial economy argues for this Court exercising its discretion in favor of retaining jurisdiction over it.

110. Since the underlying bankruptcy case was dismissed for bad faith filing, it would be unjust to permit the defendant to take advantage of the dismissal to the detriment of the Plaintiff.

111. This Court concludes that it will exercise its discretion to retain jurisdiction over this adversary proceeding.

112. This Court has core jurisdiction under 28 U.S.C. 157(b)(2)(I), (J), and (O), 11 U.S.C. 523 and 11 U.S.C. 727.

## Conclusions of Law Relating to Fraud in Connection with Specious Financing Commitments.

113. Section 523(a)(2)(A) provides:

"(a) a discharge under Sections 727, 1141, 1228(a), 128(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or extension, renewal or refinancing of credit to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

114. Under Section 523(a)(2)(A), a plaintiff must prove the following elements, by the preponderance of evidence [*Grogan v. Garner*, 498 U.S. 279, 289–91, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991)]:

a. The debtor made a materially false representation of fact.

b. The debtor knew the representation was false or made the representation with such reckless disregard for the truth that it constitutes a wilful misrepresentation.

c. The debtor made the misrepresentation with the intent to defraud or deceive[1] the creditor.

d. The creditor actually and reasonably relied upon the misrepresentation to his detriment.

115. The elements of Code § 523(a)(2)(A) mirror the requirements for proof of common law fraud. *In re Kanak*, 85 B.R. 483 (Bankr. N.D.Ill.1988).

116. As fully set forth in the Findings of Fact, the Plaintiff has proven each of these elements by the preponderance of evidence by virtue of the allegations of Plaintiff's Complaint being held confessed as true against the Defendant, and by the evidence admitted on the prove-up hearing:

a. The Defendant obtained $10,200 from the Plaintiff by making material misrepresentations pertaining to the efficacy of the R & R Investment irrevocable letter of credit and pertaining to his guarantee of a pre-Christmas closing and loan fee reduction;

b. The Defendant knew the misrepresentations were false when he made them or, alternatively, he made the misrepresentations with such reckless disregard for the truth that they constitute wilful misrepresentations;

1. Or as the Plaintiff puts it in his Pro Se Complaint, to dupe the creditor.

c. The Defendant possessed an actual intent to defraud the Plaintiff; and

d. The Plaintiff actually and reasonably relied upon the Defendant's representations to his detriment. He paid $10,200 for a worthless financing commitment.

### Conclusions of Law—Fraud Relating to Short Term Loan and Investment

117. As fully set forth in the Findings of Fact, the Plaintiff has similarly proven each of the § 523(a)(2)(A) elements with respect to the $35,000 he paid the Defendant for his short term loan and investment in the 1714 North Damen property:

a. The Defendant obtained $35,000 from the Plaintiff by making material misrepresentations including: that he had a contract to purchase the 1714 North Damen property, that the financing was in place, that all he had to do was show up for the closing, and that the Plaintiff's principal would be repaid on January 2, 1995 and Plaintiff would receive no less than a $70,000 profit on the transaction;

b. The Defendant knew the misrepresentations were false when he made them or, alternatively, he made the misrepresentations with such reckless disregard for the truth that they constitute wilful misrepresentations;

c. The Defendant possessed an actual intent to defraud the Plaintiff; and

d. The Plaintiff actually and reasonably relied upon the Defendant's representations to his detriment. He paid $35,000 for a worthless promise of repayment of repayment from the Defendant from a real estate development in which the Defendant actually had no interest.

### Conclusions of Law—Common Law Fraud

118. By proving the elements of fraud under ¶ 523(a)(2)(A), the Plaintiff has also proven common law fraud against him by the Defendant. *In re Kanak*, 85 B.R. 483 (Bankr.N.D.Ill.1988).

119. The only question is whether Plaintiff's Pro Se Complaint gave notice to the Defendant that Plaintiff was suing him for common law fraud in addition to objecting to his discharge.

120. Federal "notice" pleading merely requires, in order to state a claim for relief, that plaintiff give notice to the defendant of the theory behind claims alleged and the basic facts supporting the allegations. *Maclin v. Paulson*, 627 F.2d 83, 86 (7th Cir.1980). All that is required is that fair notice is given, including the basic outline of the fraud and who made the misrepresentations and the time and place they were made. *In re Volpert* 175 B.R. 247, 258 (Bankr. N.D.Ill.1994).

121. The Plaintiff's Complaint gave the Defendant fair notice that Plaintiff was alleging common law fraud and entry of an order in his favor compensating him for Defendant's common law fraud.

a. As more fully set forth in the Findings of Fact, the Complaint alleged that the Defendant made false representations as part of a "fraud scheme". [Complaint, ¶ 6].

b. The Complaint also alleges intentional deception by the Defendant [Complaint, ¶ 3], deception by the Defendant and resulting loss to the Plaintiff of large sums of money [Complaint, ¶ 4], and detrimental reliance by the Plaintiff [Complaint, ¶ 8, 9, 10], and that the money Defendant gained from the Plaintiff was gained fraudulently [Complaint, ¶ 11].

c. The entire second half of the three page Pro Se Complaint is entitled "Regarding the Dischargeability of **Debt Due to Fraud**".

d. Finally, in his prayer for relief, the Plaintiff requested "That the Court grant a judgment in favor of the plaintiff, Noel Rodriguez in an amount to be determined at trial". [Complaint, p. 3]

122. The Defendant was on notice that the gist of Plaintiff's Complaint was that the Defendant had perpetrated fraud upon the Plaintiff and that the Plaintiff was requesting the Court to enter an order so finding, including a money judgment in the Plaintiff's favor and against the Defendant. The Defendant was also on notice as to the basic outline of the fraud and who was alleged to

have made the misrepresentations and the time and place they were made.

■ 123. The Defendant committed common law fraud upon the Plaintiff and the Defendant is liable to the Plaintiff in the amount of $45,200 resulting from such common law fraud and a money judgment in that amount will be entered in favor of the Plaintiff.

### Conclusions of Law—False Oath and Concealment

■ 124. As fully set forth in the Findings of Fact, the Plaintiff proved that the Defendant had an ownership interest in the Jeep when he filed his schedules, and that he intentionally, with intent to hinder, delay, or defraud his creditors or the trustee, concealed that ownership interest.

125. Consequently, the debtor's discharge is denied pursuant to 11 U.S.C. 727(a)(2).

126. As fully set forth in the Findings of Fact, the Plaintiff proved that the Defendant knowingly and fraudulently made false statements on his Statement of Financial Affairs when he stated that the Jeep (1) was subject to liens, (2) had been transferred to Jem Builders, and (3) had been sold by Jem Builders to pay claims.

127. Consequently, the debtor's discharge is denied pursuant to 11 U.S.C. 727(a)(4).